United States District Court
Southern District of Texas

**ENTERED**

September 18, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EQUISTAR CHEMICALS, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:18-CV-04349 |
| | § | |
| INDECK POWER EQUIPMENT | § | |
| COMPANY | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending in this case, which has been referred by the District Judge to the Magistrate Judge for all pretrial proceedings, is Plaintiff Equistar Chemicals, L.P.'s Motion for Partial Summary Judgment (Document No. 23), and Defendant's Motion for Final Summary Judgment (Document No. 25). Having considered the cross motions for summary judgment, the responses and additional briefing, the summary judgment evidence, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Final Summary Judgment both be DENIED.

## I.      Background

This case is essentially a breach of contract and declaratory judgment action based on Plaintiff Equistar Chemicals, L.P.'s ("Equistar") purchase of two steam boilers and related control instrumentation from Indeck Power Equipment Company ("Indeck") for $6.7 million. As is not disputed, Equistar planned to use the boilers for petrochemical production in their Tuscola, Illinois facility. Two documents accompanied the sale: (1) the Master Maintenance Repair Operating

Materials, Shop Repair Services, and Occasional On-Site Services Contract ("Master Contract"), effective December 8, 2015, and (2) a purchase order agreement, effective December 11, 2015. The terms provided in the Master Contract govern the parties' relationship and specifically provided that they could not be modified or amended by any purchase order. No one disputes that the terms were never amended.

In mid 2017, Indeck delivered the boilers, and the programmable logic controllers (known as and referred to herein as "PLC's) used to control the boilers, to Equistar at Equistar's Tuscola facility. That PLCs were delivered with the software installed on them, and upon delivery, Indeck worked with Equistar to customize the software. Prior to, upon delivery, and after delivery, Equistar made repeated requests for access to the software source code. Indeck has refused each of those requests. That repeated refusal has led to this lawsuit, with Equistar alleging that it is entitled to "read and write" access to the instrumentation software source code, and asserting a claim against Indeck for breach of the Master Contract. Equistar also seeks a declaration that it either owns, or has an irrevocable license to, the source code under the terms of the Master Contract.

## II.     Arguments for Summary Judgment

The parties have filed Cross Motions for Summary Judgment on Equistar's claim(s) that it is entitled to read and write access to the source code.   Equistar argues that it is entitled to such access under sections 19(b), 19(a)(iii) and/or 19(d) of the parties' Master Contract. Indeck, in contrast, argues that the source code is its "confidential information," the ownership of which it retained under section 19(a)(I) and 19(a)(iii) of the Master Contract, and that the only "license" Equistar obtained under the Master Contract was a license to "use" the software. As is relevant to

2

the claims and issues in this case, the Master Contract provides as follows:

1.    **Definitions.**  The following definitions shall set forth the meaning of the terms used herein. If a term is undefined, its ordinary meaning shall apply.

\* \* \*

"Buyer Data"shall mean any and all Buyer provided data, records, and information (i) to which Seller has access, (ii) that is provided to Seller by Buyer, (iii) that is or may be incorporated into any of Seller's Work, and (iv) that may be Buyer proprietary or Confidential Information.  Buyer Data may also include: any Drawings, data, Specifications, instructions (operations and maintenance), schedules, packing lists, and any other literature provided by the Subcontractors or Suppliers but excludes any intellectual property of such parties and Seller Intellectual Property.  Buyer Data is and shall remain the property of Buyer and Buyer shall retain exclusive rights and ownership thereto.

\* \* \*

"Seller Intellectual Property" shall mean any Seller information, in any form, that includes trade secrets, copyrights, inventions, patents, discoveries, know-how, samples, techniques, specifications, drawings, designs, design concepts, manuals, processes and testing methodology. Seller Intellectual Property includes Confidential Information of Seller and shall not include any Buyer Data or Confidential Information of Buyer. Seller shall retain exclusive rights and ownership of Seller Intellectual Property and Seller is not obligated to provide Buyer any such information of Seller considered proprietary by Seller except as necessary for purposes of the Contract.

\* \* \*

19.    **Ownership.**

a.    Intellectual Property Ownership.

i.    Title to all Buyer Data plans and Specifications, Drawings, and technical data, including, but not limited to, drawings, flow diagrams, layout details and specifications, computer programs and their contents which (i) have been furnished by Buyer to Seller shall belong to and remain the property of Buyer. All intellectual property and results of the Work, including software, models, designs, drawings, documents, inventions and know-how, conceived or

3

developed by Seller in connections with the Contract are the sole property of Seller.

ii.    No right, title, or interest in Seller Intellectual Property will be transferred to Buyer under this Contract, including Seller Intellectual Property which existed prior to, or is created during or independent of, the performance of the Contract.

iii.    For Buyer Data, Seller shall promptly disclose to Buyer all inventions, discoveries and improvements (whether patentable or not) conceived or made by Seller, jointly with Buyer, and resulting from Seller's Work under this Contract, or from information made available to, or acquired by Seller, or its employees, under this Contract. Seller shall assign to Buyer each such invention, discovery and improvement to Buyer Data.

b.    <u>Intellectual Property Assignment</u>.  All Seller Work product shall be the property of Buyer. With respect to Buyer Data in Section 19(a) above, Seller shall assign or cause to be assigned to Buyer all copyrights, trademarks and all inventions, patentable and un-patentable, (i) relating to the Work, (ii) developed by Buyer and Seller (or its Subcontractors), and (iii) in the course and scope of the Work. Seller shall execute or cause its Subcontractors to execute any instruments necessary to carry out such assignment. Seller shall execute papers and render other reasonable assistance requested by Buyer in connection with the assignment, prosecution or enforcement of any patent or patent applications covering each such invention, discovery, or improvement. All contracts with Seller's Subcontractors shall provide terms implementing the above.

* * *

d.    <u>License</u>.  Seller hereby grants Buyer only an irrevocable, royalty free, nonexclusive license to use any and all technologies, patent rights, copyrights and trade secret rights (collectively, the "Technologies") owned and controlled by Seller that are necessary for the installation, erection, or use (including operation, maintenance, repair, reconstruction and modification) of the Work.

* * *

4

20.     **Confidential information**

    a.    <u>Confidential Information</u>:

        i.    As used herein, "Confidential information" means all confidential information of Buyer disclosed to Seller, whether orally or in writing, that is designed or identified as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances surrounding the disclosure, including, but not limited to, the terms and conditions of the Contract Documents (including pricing and other terms reflected in any Attachment, Schedule, Exhibit, Scope of Supply, or otherwise incorporating the terms and conditions hereof), data, plans, reports, manuscript, procedures, schedules, logs, cores, core data, cuttings, reports and records, Drawings, Specifications, results, source codes, models, programs, business and marketing plans, technology and technical information, product designs, trade secret and business processes, or other work product which is: (a) received or ascertained by Seller, directly or indirectly, from Buyer, its licensors or other contractors, or (b) originated or otherwise acquired by Seller or Subcontractors from Buyer in connection with, as a result of, or incident to work-related bids or proposals and/or to performance of the Scope of Supply. Confidential information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to Buyer, (ii) was known to Seller prior to its disclosure by Buyer without restriction on use or disclosure; (iii) was independently developed by Seller without breach of any obligation owed to Buyer or (iv) is rightfully received from a third party without restriction on use or disclosure.

* * *

        vi.    Likewise, the provisions of this Article 20 shall be reciprocal and shall apply to Buyer with respect to "Confidential Information of Seller" (and Seller's ownership there[of]) provided by Seller to Buyer under this Contract; provided however that Buyer shall have the right to disclose Confidential Information of Seller to third parties under obligations of confidentiality as necessary for the installation, erection, or use (including operation, maintenance, repair, reconstruction and modification) of the Work.

Master Contract (Document No. 23-1 at 6, 7, 18-19, 20).

Equistar argues in its Motion for Summary Judgment that it is entitled to ownership or access to the source code based on:

> three separate contractual bases . . . . First, the contract between the Parties assigns Equistar ownership of all of Indeck's work product, which necessarily includes the software needed to operate the boilers. Second, it also grants Equistar an ownership interest in any technology conceived or made by Indeck jointly with Equistar during the project, which includes the software sought here. And third, alternatively, the contract gives Equistar an irrevocable, royalty free, nonexclusive license to the software.

Equistar's Motion for Summary Judgment (Document No. 23) at 5. Indeck, in contrast, argues that the term "source code" is used in the Master Contract only once, in section 20, and that its source code is included as its "confidential information," which Indeck retained as part of its "Seller Intellectual Property." Indeck also argues that Equistar may have been granted a license to "use" the software, it was not given a license, or any other read and write access, to the source code.

## III.    Summary Judgment Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating that there exists no genuine issue of material fact. *Brandon v. Sage Corp.*, 808 F.3d 266, 269—70 (5th Cir. 2015) (citing *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986)). Once the moving party meets its burden, the burden shifts to the nonmovant, "who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists" and that summary judgment should not be granted. *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir.

2008); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).[1] A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *Celotex*, 106 S. Ct. at 2548. Instead, the non-movant "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment." *Brandon*, 808 F.3d at 270 (quoting *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006)).

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are to be viewed in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). "If the record, viewed in the light most favorable to non-movant, could not lead a rational trier of fact to decide in non-movant's favor, summary judgment is appropriate." *Allen v. Radio One of Texas II, LLC*, 515 Fed. Appx 295, 299 (5th Cir. 2013) (citing *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Kelley*, 992 F.2d at 1413. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2513 (1986).

---

[1] Where "the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transp. A/S v. Int'l Marin Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

## IV. Discussion

This dispute centers on how the terms of the Master Contract relate to the parties' competing claims to the source code. Contract interpretation is generally based on the substantive law of the forum state, here Texas, *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007), with this Court applying Texas law in the manner acceptable to the Texas' highest court. *Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 328 (5th Cir. 2001) ("Under the Erie doctrine, [courts] are bound in diversity cases to apply the substantive law of the forum state as interpreted by the state's highest court." internal citation omitted.): *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011) ("The Court 'look[s] to decisions of the state's highest court, or in the absence of a final decision by that court on the issue under consideration, [] must determine in [its] best judgment, how the state's highest court would resolve the issue if presented with it.'").

In Texas, to prevail on a breach-of-contact claim, a party must establish: (1) the existence of a valid contract between the plaintiff and the defendant, (2) that the plaintiff tendered performance or was excused from doing so, (3) that the defendant breached the terms of the contract, and (4) that the plaintiff sustained damages as a result of the defendant's breach. *West v. Triple B. Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A breach occurs when a party fails or refuses to do something that party has promised to do. *Id.*

When construing a contract, a court's primary goal is to determine the parties' intent as expressed in the terms of the contract. *Chrysler Ins. Co. v. Greenspoint Dodge of Hous., Inc.*, 297 S.W.3d 248, 252 (Tex. 2009); *Coker v. Coker*, 650 S.W.2d 391, 393 9Tex. 1983). Pursuant to general rules of contract construction, the language used by parties to a contract should be accorded a plain grammatical meaning, unless it definitely appears the intention of the parties would thereby

8

be defeated. *See Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987); *Lyons v. Montogomery*, 701 S.W.2d 641, 643 (Tex. 1985). If a contract is worded so that it can be given a certain or definite meaning or interpretation, it is not ambiguous, and therefore a court should construe the contract as a matter of law. *See United States v. Fid. & Deposit Co.*, 10 F.3d 1150, 1152 (5th Cir. 1994); *see also Coker*, 650 S.W.2d at 393 (mandating that unambiguous provisions appearing in a contract must be given the plain meaning of their terms); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968) (noting that absent ambiguity, "the construction of the written instrument is a question of law for the Court"). Consequently, a fact issue arises as to the proper interpretation of a written contract only if the contract is ambiguous. *In re Fender*, 12 F.3d 480, 485 (5th Cir. 1994). An agreement, however, is not ambiguous merely because the parties disagree upon its correct interpretation; rather, it is ambiguous only if both interpretations are reasonable. *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir. 1992). A court cannot look to extrinsic evidence outside of the contract to create an ambiguity. *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006); *see also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). It is only when a contract has been determined to be ambiguous, that extrinsic evidence can be considered in determining the parties' intent. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764–65 (Tex. 2018) ("'Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument. [N]o issue regarding the parties' intentions is raised *unless* the [contract] is ambiguous—and evidence of those intentions cannot be used to create an

9

ambiguity.'").

Here, Equistar asserts that the Master Contract grants it ownership of, or access to, the source code in three separate provisions: 19(a)(iii), 19(b), and 19(d). Each provision will be considered in turn.

### A.    Section 19(a)(iii): Ownership from Joint Improvements with Indeck

Equistar argues that it is entitled to summary judgment on its breach of contract claim because the Master Contract unambiguously grants Equistar, in section 19(a)(iii), ownership of all "inventions, discoveries and improvements (whether patentable or not) conceived or made by [Indeck], jointly with [Equistar], and resulting from [Indeck]'s Work under this Contract, or from information made available to, or acquired by [Indeck], or its employees, under this Contract." According to Equistar, it provided information to Indeck from which Indeck modified and improved the software source code such that it, under the second clause of Section 19(a)(iii), gained ownership of the modified (and improved) source code.   Key to this argument from Equistar's standpoint is whether the modifications were made by Indeck to the source code "jointly with Equistar." Equistar maintains that they were.  Indeck, in response, does not address whether the software can be said to have been modified through the "joint efforts" of it and Equistar; instead, Indeck focuses on the "Buyer Data" language in section 19(a)(iii) of the Master Contract, which Equistar seems to ignore.

As set forth above, section 19(a)(iii) states: "For Buyer Data, Seller shall promptly disclose to Buyer all inventions, discoveries and improvements (whether patentable or not) conceived or made by Seller, jointly with Buyer, and resulting from Seller's Work under this Contract, or from information made available to, or acquired by Seller, or its employees, under this Contract.  Seller shall assign to Buyer each such invention, discovery and improvement to Buyer Data." As argued

by Indeck, section 19(a)(iii) only applies to "Buyer Data," which is defined in the Master Contract as "any and all Buyer provided data, records, and information (i) to which Seller has access, (ii) that is provided to Seller by Buyer, (iii) that is or may be incorporated into any of Seller's Work, and (iv) that may be Buyer proprietary or Confidential Information." No argument has been made, nor could it be, that the software source code constitutes "Buyer Data" under the Master Contract. As such, section 19(a)(iii) does not provide Equistar with a viable basis for claiming an ownership interest in the source code.

**B.      Section 19(b): Ownership from Assignment of Work Product**

Equistar next argues that it is entitled to summary judgment on its breach of contract claim because the Master Contract, in section 19(b), unambiguously states that "All [Indeck] Work product shall be the property of [Equistar]." According to Equistar, Indeck's "work product" included the boilers, the PLCs, <u>and</u> the software that controlled the PLCs. Indeck responds that its "work product" is limited to the boilers and PLC's, and that the Master Contract specifically maintained its exclusive ownership interest in its Intellectual Property, including the source code for the software that controlled the PLC's. Tracing the language of the Master Contract, the Magistrate Judge agrees with Indeck's interpretation that the source code is not "Work Product," and consequently, Equistar is not entitled to the source code under section 19(b) of the Master Contract.

As set forth above, in the definition section of the Master Contract, it states that "Seller [Indeck] shall retain exclusive rights and ownership of Seller Intellectual Property and Seller is not obligated to provide Buyer [Equistar] any such information of Seller considered proprietary by Seller except as necessary for purposes of the Contract." In that same provision of the Master Contract, "Seller Intellectual Property" is defined as including "any Seller information, in any form, that

11

includes trade secrets. . . . [and] includes Confidential Information of Seller." "Confidential information," in turn, is defined in the Master Contract, as "confidential information of [Seller] disclosed to [Buyer], whether orally or in writing, that is designed or identified as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances surrounding the disclosure, including, but not limited to, the terms and conditions of the Contract Documents (including pricing and other terms reflected in any Attachment, Schedule, Exhibit, Scope of Supply, or otherwise incorporating the terms and conditions hereof), data, plans, reports, manuscript, procedures, schedules, logs, cores, core data, cuttings, reports and records, Drawings, Specifications, results, source codes, models, programs, business and marketing plans, technology and technical information, product designs, trade secret and business processes, or other work product which is: (a) received or ascertained by [Buyer], directly or indirectly, from [Seller], its licensors or other contractors, or (b) originated or otherwise acquired by [Buyer] or Subcontractors from [Seller] in connection with, as a result of, or incident to work-related bids or proposals and/or to performance of the Scope of Supply." Section 19(a)(i) and (a)(ii) of the Master Contract further provides that "All intellectual property and results of the Work, including software, models, designs, drawings, documents, inventions and know-how, conceived or developed by Seller in connection with the Contract are the sole property of Seller. . . . No right, title, or interest in Seller Intellectual Property will be transferred to Buyer under this Contract, including Seller Intellectual Property which existed prior to, or is created during or independent of, the performance of the Contract."

Nothing in the Master Contract supports Equistar's argument that Indeck's work product included the software source code. Work product is not defined, *per se*, in the Master Contract, but

cannot, in light of the Master Contract's definitions of "Seller Intellectual Property" and "Confidential Information," be said to include the software source code. Consequently, section 19(b) does not provide Equistar with a viable basis for claiming an ownership interest in the source code.

### C.    Section 19(d): Irrevocable License

Equistar finally argues that it is entitled to summary judgment on its breach-of-contract claim, because the Master Contract, in Section 19(d), unambiguously grants Equistar a broad, "irrevocable, royalty free, nonexclusive license to use any and all technologies, patent rights, copyrights and trade secret rights (collectively, the "Technologies") owned and controlled by [Indeck] that are necessary for the installation, erection, or use (including operation, maintenance, repair, reconstruction and modification) of the Work." § 19(d).  It is here that Equistar's position has some traction, for the bundle of rights created or associated with a software copyright includes the software's source code. As was explained by the Fifth Circuit over a decade ago in *General Universal Systems, Inc. v. Hal, Inc.*, 379 F.3d 131, 142 (5th Cir. 2004), "[i]t is settled that computer programs are entitled to copyright protection.  This protection extends not only to the "literal" elements of the computer software – the source code and object code – but also to a program's nonliteral elements, including its structure, sequence, organization, user interface, screen displays, and menu structures."

Here, given Indeck's copyright in the software source code, the question becomes whether Equistar, pursuant to section 19(d) of the Master Contract is entitled to an "irrevocable license to use" the source code.  That turns on whether the source code is "necessary for the installation, erection, or use (including operation, maintenance, repair, reconstruction and modification) of the Work."  Whether the source code is needed for the "use" of the boilers and related equipment, including the PLC's, cannot be determined as a matter of law on this summary judgment record.

13

That is because while Equistar is adamant that it needs the source code to both trouble-shoot problems with the boiler system, including unexplained shut-downs of the system, *see* Deposition of Maureen Radi (Document No. 23-4 at 13-14, 21) and Deposition of Rose O'Donnell (Document No. 23-6 at 6), and to modify the system in the event instrumentation is added, *see* Deposition of Holly Tutich (Document No. 23-5 at 19), Indeck is equally as adamant that Equistar has no need for the source code because the boilers have, and are, operating according to design.  Because the summary judgment evidence raises a genuine issue of material fact on whether the source code is "needed" for the use "(including [the] operation, maintenance, repair, reconstruction and modification)" of the boilers and the related equipment, including the PLC's, neither Equistar nor Indeck are entitled to summary judgment on the breach of contract and declaratory judgment claims asserted by Equistar in this case.  Instead, it will be for the factfinder to determine whether Equistar, under section 19(d) of the Master Contract, is entitled to an irrevocable license to "use" the source code made the basis of this case.

## V.    Conclusion and Recommendation

Based on the foregoing, and the conclusion that genuine issues of material fact exist on whether Plaintiff Equistar is entitled to obtain and use the source code made the basis of this suit though the license provisions in Section 19(d) of the Master Contract, the Magistrate Judge

RECOMMENDS that Plaintiff's Motion for Summary Judgment (Document No. 23) and Defendant's Motion for Summary Judgment (Document No. 25) both be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file

written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this ___16th___ day of September, 2019.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE