United States District Court
Southern District of Texas
**ENTERED**
August 17, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EQUISTAR CHEMICALS L.P., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-4349 |
| | § | |
| INDECK POWER EQUIPMENT COMPANY, | § | |
| | § | |
| Defendant. | § | |

## ORDER

In December 2015, Plaintiff Equistar Chemicals L.P. ("Equistar") and Defendant Indeck Power Equipment Company ("Indeck") entered into a contract entitled the "Master Maintenance Repair Operating Materials, Shop Repair Services, and Occasional on-Site Services Contract (the "Master Contract"). A few days later, Equistar purchased two industrial steam boilers pursuant to the Master Contract. The control system for the boilers utilizes a software code—referred to as the "source code"—that Indeck wrote and maintains.

The pending dispute is over whether the Master Contract conveyed to Equistar a license to the source code that operates on the boilers it purchased from Indeck. Equistar argues that the answer is yes; Indeck, of course, contends that the answer is no. If the Master Contract conveys a user-license to Equistar for the source code, the parties also disagree on whether the scope of the license includes "read and write access."

The parties and their counsel appeared before this Court for a bench trial. Each side presented evidence during trial, produced briefing, and made their respective arguments as to the effects of the evidence, and the Court hereby issues its findings of fact and conclusions of law.

## I.   Procedural History

On November 16, 2018, Equistar filed this lawsuit against Indeck for breach of contract and declaratory judgment (Doc. No. 1). Specifically, Equistar pleaded that its purchase of two boilers from Indeck included the acquisition of the boiler system's source code under sections 19(a)(iii) and 19(b) of the Master Contract. Alternatively, Equistar alleged that section 19(d) of the Master Contract granted it an irrevocable user-license as to source code.

The parties filed cross-motions for summary judgment, which were initially referred to the United States Magistrate Judge. (Doc. Nos. 23 and 25). The Magistrate Judge recommended: (1) that Indeck's motion be granted as to Equistar's sections 19(a)(iii) and 19(b) theories; (2) that Indeck's motion be denied as to the license theory; and (3) that Equistar's motion be denied in its entirety. (Doc. No. 44). This Court adopted the Magistrate Judge's recommendation over the parties' objections. (Doc. No. 47). Thereafter, the Court held a two-day bench trial that focused on Equistar's access to the source code under section 19(d) of the Master Contract.

Following the trial, the parties each filed post-trial briefs. (Doc. Nos. 54 and 55). They both also filed reply briefs in response to the other side's post-trial briefs. (Doc. Nos. 56 and 57). Indeck then filed a sur-reply brief, with leave of Court. (Doc. No. 58, Ex. 1; *see also* Doc. No. 60). Finally, Equistar filed a response to Indeck's sur-reply brief. (Doc. No. 61).

## II.   Findings of Fact

### A.   Background Facts

#### 1.   Equistar

Equistar is a wholly owned subsidiary of LyondellBasell. It operates chemical facilities that manufacture hydrocarbon chemicals. The chemical plant at issue in this case is in Tuscola, Illinois (the "Plant" or the "Tuscola Plant"). The Tuscola Plant produces a somewhat rare,

synthetic ethanol that is used for several nonindustrial uses, such as for cough syrup and beauty products. Equistar is one of the few companies in the world that produces synthetic ethanol, and the Plant is the only chemical manufacturing site in North America that does so.

A simplistic overview of the process of creating syntenic ethanol is that raw ethylene is mixed with steam. The chemical reaction turns the mixture into an ethanol alcohol product, which Equistar sells to its customers. To provide steam for the ethanol production, the Plant utilizes industrial boilers. When the Tuscola Plant opened in 1953, Equistar owned and controlled coal-fired boilers. Although Equistar has controlled the Plant since its opening and used the steam produced by the boilers, it sold the boiler operation around 1998. After a few intervening transfers, Equistar repurchased the boilers in 2017.[1]

Equistar's manufacturing process is continuous; the Tuscola Plant only has scheduled partial shutdowns for maintenance once a year and total shutdowns once every three to five years. Unplanned shutdowns—referred in the industry as "trips"—also interrupt Equistar's synthetic ethanol operation. Trips typically occur when a boiler stops working unexpectedly. If either of the two boilers at the Tuscola Plant trips, then the entire Plant must shut down. Needless to say, trips are undesirable. Not only do trips present economic and business interruptions, but they also involve significant safety concerns because there is potential for a hazardous chemical reaction.

## 2.  Indeck

Indeck is one of four companies that are owned by the same family. The other three companies are Indeck Boiler Corporation, Indeck Keystone, and Indeck Energy. Defendant Indeck Power Equipment Company was established in 1960; however, Indeck Keystone's predecessor

---

[1] Despite not owning the boilers, Equistar was able to access and modify the boiler system's software and use the boilers in its manufacturing process.

began operating in the 1800s. Marsha Lynn Forsythe is the CEO and president of Indeck Power, Indeck Boiler, and Indeck Keystone.

Indeck is a leading manufacturer and seller of industrial boilers, which is a very competitive industry.[2] There are approximately 5,000 Indeck boilers in operation around the world. Indeck's customers range from refineries and paper mills to universities and airports. Of course, Indeck also sells boilers to customers operating chemical plants, like Equistar.

The boilers that Indeck sells—and sold to Equistar—are controlled by industrial computers called Programmable Logic Controllers ("PLCs") that sit in cabinets near the boilers.[3] Each boiler has two corresponding PLCs: a combustion control system PLC and a burner management system PLC. The combustion control system PLC manages the boilers' day-to-day combustion. The burner management system PLC ensures the boiler system is not exceeding its tolerance limits or operating in a dangerous condition. These PLC systems essentially control and monitor the boilers' parameters, including air and fuel delivery, temperature, pressure, and water height.

### 3.  The Source Code

The core issue in this case is the software program that runs or commands the operating system for the PLCs. This software is an interface program that translates the computer coding to an understandable format for the operators and other engineers working with the boilers. This program is commonly referred to as the source code.[4]

---

[2] Indeck Boiler is the company that manufactures the boilers and Indeck Power is the company that sells them to customers. (*See* Tr. at 530 (testimony of Marsha Lynn Forsythe)). Thus, Indeck Power sold to Equistar boilers that were manufactured by Indeck Boiler. (*Id.*).

[3] The PLC hardware is produced by a third-party (Allen-Bradley), and the operating system on the PLCs is made by another third-party (Rockwell Automation). Ms. Forsythe testified that Indeck's customers will "quite frequently" buy the boilers from Indeck without the PLCs and Indeck's software. (Tr. at 471, 484).

[4] At the trial some witnesses used other names for the source code, including "program," "logic," "ladder logic," "control logic," "operating instructions," and "source protection." Even though the term "source code" may be lacking

The source code is the nerve center of the PLCs—witnesses also described the source code as the "central brain [that is] handling the inputs and outputs" of the boiler system and "the nuts and bolts of how [the PLCs are] going to operate." (Tr. at 111 (Testimony of Perry Danniger Smith, chemical engineer for Equistar); Tr. at 364 (Testimony of Richard A. Gehse, P.E., mechanical engineer and expert witness for Equistar)). The boilers have several sensors and instruments gathering information that send signals to the PLCs. The PLCs interpret those signals and respond according to the source code's direction. In other words, the source code determines what course of action the PLC directs to the other instruments in the boilers. (Tr. at 75 (Testimony of Perry Danniger Smith) ("**Q.** . . . [T]he source code is what dictates how the boiler reacts given these various indications from all of the[] components? **A.** Yes.")).

Although a source code comes preinstalled on the PLCs, Indeck has developed its own proprietary source code over decades. Both sides agree that Indeck's source code is "unique," "special," and gives Indeck a competitive advantage. (*See id.* at 122; Tr. at 470 (Testimony of David Pruyn, control engineer for Indeck); Tr. at 564 (Testimony of Marsha Lynn Forsythe).

Ms. Forsythe testified that Indeck's source code is not subject to copyright protection; instead, the company treats it as a trade secret. (Tr. at 564). To keep that proprietary information confidential—and to insulate Indeck from litigation—Indeck refuses to provide its customers access to the source code. (*See* Tr. at 412 (Testimony of David Pruyn) ("**Q.** Is Indeck proprietary source code disclosed to third parties or customers? **A.** No, never.")).

Both Equistar's and Indeck's witnesses explained at trial that Indeck's decision to not share its source code with its customers is unusual. (*See, e.g.*, Tr. at 192 (Testimony of Perry Danniger Smith) ("In my experience, at other sites we have [the source code]. I know at Tuscola we do; and

---

in technical precision, both parties use that term in their pleadings, at trial, and in their briefs. Accordingly, the Court will also use that term.

at Clinton where I am, I manage a group of engineers and specialists that code and work with vendors and do these types of projects. We have access to all of their source codes."); Tr. at 321 (Testimony of Richard A. Gehse) ("I couldn't count the numbers of boilers I've put in. I can't think of a single example where I did not have the source code. Not a one. And that goes back 40 years. . . . [The owner of the boilers not having source code access is] [v]ery unusual. Very unusual. If you've got a process boiler, you've got the source code."); Tr. at 406 (Testimony of David Pruyn) ("**Q.** . . . In your pre-Indeck work history, did you have access to read or write source code on clients' boilers? **A.** . . . That is quite common."); Tr. at 537 (Testimony of Marsha Lynn Forsythe) ("[W]hen a client requires a source code, which is not uncommon—I say a good guess is maybe one out of ten clients will ask for the source code.")). Understanding that not sharing the source code is abnormal in the industry, Ms. Forsythe testified that if a client requires access to the source code she gives them several choices to proceed.

> [T]he choices are, number one, [the client] can provide the control system [itself] and just buy [Indeck's] boiler and [Indeck's] economizers and fans and the whole boiler island. Or if [the client] likes, [Indeck] can buy the control system from the burner manufacturer. . . .
>
> And [Indeck will] say that [it] can't give [the client] [Indeck's source code] because [it] want[s] open source, but [Indeck] can give [it] this one and [Indeck will] trade it out. So we do it either way—take it out, leave it in, whatever the client would prefer.

(Tr. at 537–38).

In fact, Indeck has turned down orders and lost business because of its source code policy. (*See id.* at 538). Simply put, Indeck believes that it "couldn't possibly make enough money to take the liability and the risk [of] giving [a client] the source code." (*Id.* at 539).

**B.   The Parties' Transaction**

**1.   The Master Contract**

In 2015, the Tuscola Plant's boilers—which were coal-fired and had been operating for over 50 years—needed to be replaced. Equistar entertained multiple bidders for the project, but ultimately selected Indeck. After approximately ten revisions to Equistar's contract template, on December 8, 2015, the parties signed the Master Contract. (*See generally* Plaintiff's Ex. 11; Defendant's Ex. 10). That document "establish[ed] certain terms and conditions which shall apply to and become a part of each and every Purchase Order Release, contract or other document for [materials or equipment from Indeck] and/or [services, including shop repair and on-site services performed by Indeck] entered into between the parties." (Plaintiff's Ex. 11 at 1). As is relevant for this order, section 19 of the Master Contract concerns ownership of intellectual property. Subsection (d) of section 19 is a license provision that states:

> [Indeck] hereby grants [Equistar] only an irrevocable, royalty free, nonexclusive license to use any and all technologies, patent rights, copyrights and trade secret rights (collectively, the "Technologies") owned and controlled by [Indeck] that are necessary for the installation, erection, or use (including operation, maintenance, repair, reconstruction and modification) of the Work.

(*Id.* at 14).

A few days after signing the Master Contract, Equistar issued a purchase order pursuant to the Master Contract for the purchase and installation of two boilers and corresponding PLCs at the Tuscola Plant. The purchase price was approximately $7 million. In January 2016, the parties had a kickoff meeting for the project. It is undisputed that at that meeting Equistar's representatives asked to have "read and write access" to the source code; Indeck refused that request. (Tr. at 537 (Testimony of Marsha Lynn Forsythe) ("[W]e told them that absolutely under no circumstance

do I ever provide [clients with access to Indeck's source code] and they understood that and they continued moving forward.")).[5]

### 2. Testing and Installing the Boilers

#### a. Factory Acceptance Tests

Between late-February and mid-March of 2016, the boilers that Equistar purchased underwent "Factory Acceptance Tests." The Factory Acceptance Tests were the last assessment of the equipment before it was moved from Indeck's facility to the Tuscola Plant. The purpose of a Factory Acceptance Test is to make sure that the control system performs in the manner it should according to various specifications. After running numerous simulations, it is common to find certain systems not working properly or to realize modifications need to be made.

The parties did a weeklong Factory Acceptance Test for each boiler. Equistar accepted the boilers, subject to certain comments and modifications. After those tests were completed, Equistar issued a change order to receive updated documentation on the boiler system to reflect the various changes that Indeck was going to make.[6] The change order cost another $78,000.

In addition, at both of the Factory Acceptance Tests, Equistar requested Indeck turn over "read and write access" to the source code; and Indeck refused each time. (*See, e.g.*, Tr. at 276 (Testimony of Rose O'Donnell, chemical engineer for Equistar); Tr. at 383 (Testimony of

---

[5] Ms. Forsythe testified that she would have "absolutely accepted" if Equistar had backed out of the parties' transaction at the kickoff meeting due to Equistar's lack of access to the source code. (Tr. at 540–41). Although there is no evidence that she articulated this sentiment to Equistar at the time, the Court has no reason to doubt that she would have been willing to let Equistar out of the parties' contract.

[6] The parties dispute whether the level of documentation provided to Equistar is the standard level. Indeck argues that the documentation it provided exceeded the customary level, which it claims demonstrates that Equistar knew it was not going to receive "read and write access" to the source code. Equistar disagrees and contends that the documentation it received is the standard level even if it was getting "read and write access" to the source code. Because this dispute is not controlling as to the license provision in the Master Contract, the Court need not resolve it. To the extent Indeck contends that Equistar waived its rights to the source code through the documentation request, the Court rejects that argument.

Holly Tutich, principal engineer for Equistar at the Tuscola Plant)). Mr. Smith testified, however that Ms. Forsythe once offered to give Equistar access to the source code if it was "willing to waive all liability and" pay a fee for it. (Tr. at 180).

### b. Installation and the Site Acceptance Test

The new boilers and PLCs were delivered to the Tuscola Plant in mid-2017. Equistar did not have "read and write access" to the source code at that time. The parties then tested the boiler system and its operation at the Tuscola Plant—this testing is called the "Site Acceptance Test." A Site Acceptance Test shares several similarities with a Factory Acceptance Test, the most obvious difference being the location of the testing.

During the Site Acceptance Test, Equistar worked closely with Indeck's on-site technician, Bob Swanton. Despite this close relationship, it is undisputed that Mr. Swanton made changes to Equistar's boilers and PLCs based on his own volition and without telling Equistar what changes he made.

> **Q.** You mentioned that Mr. Swanton made . . . changes without our consultation. What did you mean by that?
>
> **A.** Some changes he would consult us with and he would ask us and if we would say no, he would just go to somebody else and ask. I experienced one situation where he came to me asking if he could make a change. I said no. He turned around to one of our electrical contractors and asked him if he could make the change. He doesn't even work for our company. He's just a contractor. . . .
>
>                                      ***
>
> **Q.** So do you know if that change was actually made?
>
> **A.** Many of them were. We would find out after the fact. I know for the level instruments, he made the change that he put them all on the same scale and compensated them so they showed the same in the field because he didn't like the fact that the boilers' design, the level bridles are different heights; so the level transmitters read different numbers. He didn't like that so he put it on the same scale.

We said no, you can't do that because that violates our SIS standard where we need the operators to be able to see the raw values. He came back -- he had already done it and he came back on the weekend and wouldn't remove it.

**Q.** He wouldn't remove it?

**A.** (Shaking head negatively.)

**Q.** Is it still like that in the code today?

**A.** Yes. . . .

(Tr. at 285–86 (Testimony of Rose O'Donnell); *accord* Tr. at 234, 244 (Testimony of Maureen Radí, chemical engineer for Equistar); Tr. at 396 (Testimony of Holly Tutich)).

The changes that Mr. Swanton made to the boiler system during the Site Acceptance Test are only reflected in the source code. Equistar has no other documentation that shows what exactly Swanton changed. (*See* Tr. at 466 (Testimony of David Pruyn) ("[The source code is the only place] that holds all of the field changes right now. Th[e] engineering deliverables don't hold all of the field changes that were incorporated.")). As Mr. Pruyn explained, "we could take the [source] code and look at what was changed" by Mr. Swanton. (*Id.* at 469).

The Site Acceptance Test was completed in February 2018. Once again, Indeck did not give Equistar "read and write access" to the source code; despite the fact that, according to uncontroverted testimony, Mr. Swanton told Equistar that its engineers should have access to the source code. (Tr. at 107 (Testimony of Perry Danniger Smith)).

**C.    Equistar's Operation of the Boilers**

In November 2017—before the Site Acceptance Test was finished—Indeck gave control of the boilers to Equistar. Although the new boilers began operating at the Tuscola Plant in late 2017, they did not completely replace the old coal burning boilers until around March or April of 2018. The parties agree that Equistar paid Indeck in full under the purchase order.

Since that time the boilers have been operating at the Tuscola Plant at an acceptable safety level. Equistar has, however, experienced a few glitches and problems with the boiler system. Specifically, the Plant has experienced at least one unexpected and unexplained trip and Equistar's personnel had to "fake" out the boiler system to work around the trip. This trip could have been more easily remedied using the source code.

Additionally, Equistar has identified changes and alterations it would like to make to the boiler system. In particular, it currently desires to implement some modification to the boilers, such as changing the boilers' binary switch to an analog gauge transmitter and altering the control system for the boilers' fan. Further, it is nearly certain that Equistar will have to repair and alter parts of the boilers at some point in the future. All of these changes to the boilers require corresponding changes to the source code.

According to Mr. Smith, Equistar called Indeck to work through some of the issues but received inadequate or undesirable answers and responses from Indeck. (Tr. at 105, 142). Equistar therefore does not have faith that Indeck can help ensure the safety and successful operation of the Tuscola Plant. (*Id.* at 105). Ms. Forsythe said, on the other hand, that Indeck routinely performs maintenance, repair, and update services to its clients, but that it did not do so for Equistar because Equistar refused to pay Indeck for these additional services. (*See* Tr. at 548).

### III.    The Controlling Legal Issues and the Conclusions of Law

The controlling issue for trial, as identified by the Magistrate Judge's Memorandum and Recommendation that this Court adopted, was "whether Equistar, under section 19(d) of the Master Contract, is entitled to an irrevocable license to 'use' the source code." (*See* Doc. No. 44 at 14). For the following reasons, the Court concludes that Indeck did grant Equistar a user-license to the source code under section 19(d). That conclusion, however, does not end the Court's

analysis. It must also determine whether the use of the source code grants Equistar the ability to modify the source code. Based on the Court's interpretation of the license provision, it concludes that the answer to the latter question is no.

## A.   Contract Interpretation

### 1.   Legal Standard

The parties agree that the Master Contract is governed by Texas law. (*See also* Plaintiff's Ex. 11 at 13, § 17). The essential elements for a breach of contract action under the Texas Business and Commerce Code are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[7] *Tendeka, Inc. v. Nine Energy Serv. LLC*, No. 14-18-00018-CV, 2019 WL 6872942, at *5 (Tex. App.—Houston [14th Dist.] Dec. 17, 2019, no pet.) (citing *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 814 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)); *accord Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009). There is no dispute that the Master Contract is a valid contract between

---

[7] Neither party briefed whether their contract should be interpreted under the Texas Business and Commerce Code (the "Uniform Commercial Code" or the "UCC") or Texas common law. Nevertheless, Texas courts apply the Uniform Commercial Code to applicable contracts even if the parties characterize the claim as a common law breach of contract case. *Tendeka*, 2019 WL 6872942, at *5 (collecting cases). Texas' version of the UCC applies to the sale of goods. *Summit Glob. Contractors, Inc. v. Enbridge Energy, Ltd. P'ship*, 594 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing TEX. BUS. & COM. CODE § 2.102). "Goods" are all things "movable at the time of identification to the contract for sale," with a few exceptions that do not apply in this case. TEX. BUS. & COM. CODE § 2.105(a). The Master Contract discussed the sale of goods and the occasional performance of services. In these types of cases, the UCC applies if the sale of goods is the "dominant factor" or "essence" of the transaction. *Summit Glob. Contractors*, 594 S.W.3d 700 (citing *Cont'l Casing Corp. v. Siderca Corp.*, 38 S.W.3d 782, 787 (Tex. App.—Houston [14th Dist.] 2001, no pet.)); *see also Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 901 (5th Cir. 2004). The Court finds that the Master Contract's dominant factor was the sale of the two boilers, both of which are goods. *See also Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 108 n.4 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("[A]t least one court and several academic commentators have concluded, when addressing the issue, that software is [also] a 'good' within the definition of the UCC.") (citing *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3d Cir.1991)). Thus, the Court finds the Texas Business and Commerce Code's version of the Uniform Commercial Code applies to the Master Contract.

Equistar and Indeck.[8] The parties further agree that Equistar paid Indeck in full the amount owed

under the Master Contract. Thus, the only questions at issue are: (1) whether Indeck's refusal to

give Equistar "read and write access" to the source code constituted a breach of the Master

Contract; and (2) if so, the extent Equistar suffer damage as a result of the breach, if any. *See*

*Tendeka*, 2019 WL 6872942, at *5.

In order to determine whether Equistar is entitled to "read and write access" of the source

code under the Master Contract, the Court must interpret the license provision in section 19(d).

The interpretation of an unambiguous contract is a question of law that requires the Court to use

Texas law's well-settled contract-construction principles. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d

755, 763 (Tex. 2018). In construing a contract under Texas law, courts must look to the actual

language of the parties' agreement.[9] *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,

590 S.W.3d 471, 479 (Tex. 2019). Courts should give effect to the parties' agreement as expressed

in the instrument. *Id.* In other words, "[o]bjective manifestations of intent control, not what one

side or the other alleges they intended to say but did not." *URI*, 543 S.W.3d at 763–64 (internal

citation and quotations omitted). "[Courts] therefore 'presume parties intend what the words of

their contract say' and interpret contract language according to its 'plain, ordinary, and generally

---

[8] Indeck's closing argument brief states that the parties did not have a "meeting of the minds" as to Equistar having "read and write access" to the source code. (Doc. No. 55 at 21). This may be true, but to the extent that Indeck is arguing that the Master Contract is invalid, the Court disagrees. A disagreement about contract interpretation is not the same thing as the parties lacking a "meeting of the minds." "The phrase 'meeting of the minds' describes the necessary mutual understanding regarding the essential terms of the contract." *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citation omitted); *accord Suzlon Wind Energy Corp. v. Shippers Stevdoring Co.*, 662 F. Supp. 2d 623, 647 (S.D. Tex. 2009). Indeck makes no argument that there was insufficient clarify regarding Equistar's offer to purchase the boilers or its acceptance of that offer; and the Court is not convinced that the scope of a user-license is an "essential term" of a contract to purchase two industrial boilers such the parties' failure to mutually understand this provision prevented the Master Contract from becoming a valid agreement under Texas law. *See Potcinske*, 245 S.W.3d at 530.

[9] Cases interpreting the UCC apply the same general contract interpretation standard. *See Summit Glob. Contractors*, 594 S.W.3d at 700. The UCC, however, applies some additional interpretation guidelines, which are inapplicable to the dispute in this case. *See, e.g., Anadarko Petroleum Corp. v. Williams Ala. Petroleum, Inc.*, 737 F.3d 966, 970 (5th Cir. 2013) (citing TEX. BUS. & COM. CODE §§ 1.205; 1.303; 2.202).

accepted meaning' unless the instrument directs otherwise." *Id.* at 764 (first quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010); and then quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

If the Court can give the contract's language "a certain or definite legal meaning or interpretation," then the contract is not ambiguous and is construe it as a matter of law. *Barrow-Shaver Res.*, 590 S.W.3d at 479 (quoting *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). If the contract contains two or more reasonable interpretations, then the contract is ambiguous, which creates a fact issue as to the parties' intent. *See id.*

### 2. The Court's Construction of Section 19(d)

Both Equistar and Indeck claim that the license provision unambiguously supports of its interpretation of section 19(d).[10] Equistar contends that the license grants it a license to use the source code, and that use of the source code means "read and write access." Indeck, on the other hand, argues that the license provision does not give Equistar a license to the source code; alternatively, Indeck claims that use of the source code does not include the right to modify.

As quoted above, section 19(d) states:

> [Indeck] hereby grants [Equistar] only an irrevocable, royalty free, nonexclusive license to use any and all technologies, patent rights, copyrights and trade secret rights (collectively, the "Technologies") owned and controlled by [Indeck] that are necessary for the installation, erection or use (including operation, maintenance, repair, reconstruction and modification) of the Work.

(Plaintiff's Ex. 11 at 14).

What at first glance is a long and complicated sentence can be simplified with a few key facts. First, the Master Contract defines "Work" as a combination of the "materials or equipment" sold by Indeck to Equistar and "services, including shop repair and on-site services" performed by

---

[10] The Court notes that a disagreement by the parties about the license provision's meaning does not make the Master Contract ambiguous. *See URI*, 543 S.W.3d at 763 (citations omitted).

Indeck for Equistar "as part of the Steam Boiler Project at [Equistar's] Tuscola, Illinois facility." (*Id.* at 1). The two industrial boilers and the corresponding PLCs that Indeck sold to Equistar clearly fit this definition. Thus, for purposes of this order, the Court will hereafter replace the word "Work" with the words "boilers and PLCs."

Another simplifying fact is that Equistar conceded that this lawsuit is about the installation or erection of the boilers and PLCs. (*See, e.g.*, Tr. at 111 (Testimony of Perry Danniger Smith)). It does not concern any of the services described above. In addition, the parties do not dispute the irrevocability or exclusivity of the license; nor do they ask the Court to interpret the royalty aspect of the license. Thus, for purposes of this order, the Court needs to interpret section 19(d) that can be read as follows:

> Indeck grants to Equistar a license to use any and all technologies, patent rights, copyrights and trade secret rights owned and controlled by Indeck that are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs.

(Plaintiff's Ex. 11 at 14 (modified)).

The Court interprets the plain and ordinary meaning of that provision to mean that Indeck conveyed to Equistar a license to use certain "technologies." Two separate questions naturally follow. First, what is a "technology" under the license provision? The second question is what does it mean that Equistar can "use" the technologies?

The first question—what is a "technology" under section 19(d)—is answered by the text of the Master Contract. A "technology" is "any and all technologies, patent rights, copyrights and trade secret rights" that satisfies two other requirements. The first hurdle is that the technology, patent right, copyright, or trade secret right must be owned and controlled by Indeck. The second prong of this definition is that the technology, patent right, copyright, or trade secret right must be

necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs.

The license provision therefore only applies to: (1) a technology, patent right, copyright or trade secret right; (2) that Indeck owns and controls; and (3) that is necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs.[11] [12] Visually stated, the Court determines that section 19(d) is unambiguously structured as follows:



Indeck grants Equistar a license to use any and all "Technologies"

technologies, patent rights, copyrights and trade secret rights

owned and controlled by Indeck     and     that are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs.

Once it is determined that something is a "technology" covered by the license provision, then Equistar has a license to use it. This is where the second question—what does "use" the technology mean—arises. Both sides have attempted to conflate the issue of what is a "technology"

---

[11] Indeck seems to interpret section 19(d)'s technology license as only giving Equistar a right to use the boilers and PLCs that Equistar purchased from Indeck. (Doc. No. 55 at 11 (emphasis omitted); *see also* Doc. No. 57 at 6). The Court finds no basis for the interpretation of the license provision to be this limited. Not only is it circular for *the boilers and PLCs* to be technologies that are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of *the boilers and PLCs*, but it goes without saying that Equistar is permitted to use its property (i.e., the boilers and PLCs) in any way it deems appropriate. Moreover, Indeck makes no attempt to explain why Equistar would need a license from Indeck to use the equipment it purchased and now owns.

[12] Indeck also argues that the source code is not subject to section 19(d) because Equistar's desired use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs is not truly necessary. (*See* Doc. No. 57 at 14–16). This reading of the contract is also erroneous. The unambiguous language of section 19(d) requires *the technology* to be necessary to use the boilers, not that Equistar's use *of the boilers* be necessary. Section 19(d) places no limits on how Equistar may handle the boilers and PLCs it purchased and now owns. Rather, it limits what technologies Equistar has a license to use.

and the issue of what "use" means under the contract. The Court considers that interpretation to be contrary to the plain and ordinary meaning of the words in section 19(d).

Based on the words included in the license provision and its grammatical structure, the only reasonable interpretation is that the clause "that are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the [boilers and PLCs]" is only modifying the word "technologies." Simply put, that language is irrelevant to the question of what "use" of the technology means. The inverse is also true: the "use" of technologies meaning has no bearing on whether a particular technology is subject to the section 19(d). The question of whether a technology is subject to the license provision is therefore separate and distinct from the issue of what it means to "use" the technology.

Once one has decided that the source code is covered by section 19(d), the crux of the remaining disagreement is whether the interpretation of the word "use," the first time it is used, is defined by the descriptive language the second time it is used in section 19(d). Equistar asserts the answer is yes and that the "necessary for the use" language is articulating the scope of the license to use. (*See* Doc. No. 54 at 22 (stating that the word "use" means, among other things, "[t]o employ for the accomplishment of a purpose.") (quoting *Use*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis omitted)). In other words, according to Equistar, "the scope of the license to use is defined by the purposes for which the parties agreed it would be used[,]" which is "the operation, maintenance, repair, reconstruction, and modification of the boilers and their control systems as installed at the Tuscola facility." (Doc. No. 56 at 4; *accord* Doc. No. 61 at 1–2). Thus, under Equistar's interpretation of section 19(d), "use" of the technology means whatever is necessary for

the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs.[13] Obviously, Indeck disagrees with Equistar's interpretation of their "agreement."

The plain and ordinary meaning of the words in section 19(d), as well as the grammatical structure of the sentence, dispel the notion that the language "necessary for the use (including operation, repair, reconstruction and modification) of the [boilers and PLCs]"from being a "list[] [of] the purposes to be accomplished" with the technology. (*See* Doc. No. 54 at 22). Initially, Equistar's focus on the phrase "necessary for the use" ignores the two words "that are" immediately preceding it. The only plural noun that could possibly be modified by the phrase "that are necessary for the use" is the word "technologies." Thus, grammatically, "that are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the [boilers and PLCs]" must be a description of what technologies are subject to the license provision.

Put differently, the only reasonable interpretation of the phrase "that are necessary for the use" is that Indeck's technologies are not subject to the license provision unless they are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs. Equistar's proposed interpretation entirely ignores the phrase "that are." Indeed, in order for section 19(d) to mean what Equistar says it means, the Court would have to rewrite the contract's language to eliminate that phrase.[14] *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d

---

[13] Equistar contends that modifying the source code is necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs. (*See* Doc. No. 54 at 22; Doc. No. 56 at 4). Consequently, under Equistar's interpretation of section 19(d), Equistar's "use" of the source code means that Equistar can modify the source code. The Court fully addresses this argument in Section C below.

[14] The phrase "that are necessary for" modifies the noun "use," not the verb "use" that the parties used for the first time in the infinitive earlier in section 19(d). When the parties wanted to use the phrase differently, they did. For example, later in the contract the parties demonstrated that they knew how to write this "necessary for the use" language to modify a verb as opposed to a plural noun. Specifically, in section 20(a)(vi), the Master Contract states that "[Equistar] shall have the right to disclose Confidential Information of [Indeck] to third parties under obligations of confidentiality *as necessary for the* installation, erection, and *use* (including operation, maintenance, repair, reconstruction and modification) of the Work." (Plaintiff's Ex. at 15 (emphasis added)). In this section, the "as necessary for the . . . use" clause clearly modifies the verb "disclose," which is also used in the infinitive. Equistar's interpretation of the license provision would perhaps be correct if the contract stated, like section 20(a)(vi), that

154, 162 (Tex. 2003) ("But [courts] may neither rewrite the parties' contract nor add to its language.") (citing *Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex. 1965)).

Under Texas' principles of contract interpretation, the Court must "examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.'" *Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 626 & n.27 (5th Cir. 2019) (emphasis in original) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). The only construction of section 19(d) that gives effect to all the words the parties included and does not render any particular one meaningless is that a "technology" is subject to the license if, among other things, it is necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs. Thus, the "necessary for the use" clause has no bearing on defining the scope of how Equistar can use the technology.

## B.   The Source Code is a "Technology" Under Section 19(d)

Based on the Court's interpretation of the parties' license provision, the Court must first determine if the source code is a "technology" covered by the license. Once again, that turns on whether the source code is a technology, patent right, copyright or trade secret right owned and controlled by Indeck and necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers.[15]

Aside from Equistar's theories of ownership of the source code under sections 19(a)(iii) and 19(b) that were disposed of in the ruling on Indeck's motion for summary judgment, (*see* Doc.

---

Equistar has a license to use technologies as necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs. The Court, however, must give effect to the words that the parties' used and to the manner in which they were used. *See Am. Mfrs. Mut. Ins.*, 124 S.W.3d at 162.

[15] The Court notes that the Magistrate Judge's recommendation on summary judgment, which this Court adopted, is consistent with this interpretation. (*See* Doc. No. 44, *adopted by* Doc. No. 47). It concluded that the source code is a "technology" that Indeck owns and controls. (*Id.* at 13). The Magistrate Judge then said a fact issue existed as to the second qualification (i.e., whether the source code is necessary to use the boilers). (*Id.*).

No. 44), there is no dispute that the source code is a technology (and a trade secret) that Indeck owns and controls.[16]

As for the second prong of the "technology" inquiry, the Court finds that the source code is necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs. As detailed above, the testimony at trial revealed that the source code is the nerve center of the PLCs; the PLCs, in turn, are industrial computers that control the boilers. Thus, without the source code the boilers cannot function in the steam production process.

Further, it is obvious that, despite not having "read and write access" to the source code, Equistar has already benefited from the source code in its chemical operation. The Court therefore finds that the source code is clearly necessary to the operate the boilers and PLCs. Indeck's witnesses confirmed this fact. Specifically, Ms. Forsythe agreed at trial that Equistar needs to use—and is currently using—the source code to have the boilers work at the Tuscola Plant.[17]

**Q.** . . . Today is Equistar able to -- source code sits in the program, right?

**A.** Correct.

**Q.** And they use that program every day?

**A.** They do.

---

[16] The Magistrate Judge determined the source code is a "technology" under the license provision because Indeck's copyright of the PLC software includes the software's source code. (*See* Doc. No. 44 at 13). Indeck takes issue with that determination because, as Indeck's witnesses testified at trial, Indeck does not have a copyright on its PLC software. (*See* Tr. at 564 (Testimony of Marsha Lynn Forsythe)). Although the Court finds that testimony credible, Ms. Forsythe also testified that Indeck considers the source code a trade secret. (*Id.*). Further, it is clear that the source code falls under the general umbrella of a "technology." Thus, the source code is a "technology" under section 19(d), despite not being protected by a copyright.

[17] Indeck argues that Equistar is not entitled to "read and write access" of the source code because the boilers and PLCs have been operating at an acceptable safety level at the Tuscola Plant for years without such access. This argument, however, improperly combines the analysis of whether the source code is necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs, with what it means "to use" the source code. As explained above, a technology is subject to section 19(d) regardless of what it means to "use" that technology. Thus, the source code is covered by the license provision *if it itself is necessary for the use* (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs, regardless of whether "use" of the source code means "read and write access."

**Q.** *So they're using the source code, correct?*

**A.** *That's correct.*

**Q.** *So they have the license to use.* They are, in fact, using whatever that trade secret is there?

**A.** *That's correct.*

(Tr. at 587–88 (emphasis added)).

In addition, the Court concludes that the source code is needed in order to modify or to fix certain aspects of the boilers and PLCs. (*See, e.g.*, Tr. at 317 (Testimony of Richard A. Gehse)). Indeck's witnesses conceded that fact at trial.

**Q.** Now, you had mentioned before a more extensive modification, like, for example, changing out the hardware; and we've heard some talk about changing out a -- substituting a transmitter in place of a switch?

**A.** Correct.

**Q.** *Is that the type of modification that you need source code for?*

**A.** *Yes.*

***

**Q.** . . . And so in those instances where reconstruction or modification is going to be needed . . . full read, write and modify access is necessary to do that reconstruction and modification, correct?

**A.** To do the things that we talked about, *you would need source code.*

(Tr. at 415, 479 (Testimony of David Pruyn) (emphasis added)).

**Q.** Right. So if we wanted to change a switch for a transmitter, that would be a modification, right?

**A.** That's correct.

**Q.** And I think you wouldn't disagree with Mr. Pruyn or any of the other witnesses that to make that change we would have to have source code access, correct?

**A.** *Someone would need to make changes to the source code to implement a change like that.*

(Tr. at 522 (Testimony of Dr. David A. Rockstraw, chemical engineer and a licensed professional engineer) (emphasis added)).

In fact, depending on the needed repair or modification, no witness testified that the boilers could be materially altered or revised without the source code. Accordingly, based on the overwhelming testimony of the parties, the Court concludes that the source code is a technology that is necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the boilers and PLCs.

The Court therefore finds that the source code falls under the umbrella of a "technology" under section 19(d) of the Master Contract. Accordingly, Indeck conveyed to Equistar a license to use the source code.

### C.    The Scope of the License to Use

Having determined that Equistar's acquired a license to use the source code, the Court must now evaluate the scope of that license. This question is a common one. A license to "use" software is "[p]erhaps the oldest and simplest form" of a license. 1 QUITTMEYER, ET AL., COMPUTER SOFTWARE AGREEMENTS: FORMS AND COMMENTARY § 1:24(6)(a) (Aug. 2020). "But a license 'to use' software begs the question whether 'use' includes copying or modification of the software and for what purpose." *Id.* The critical question thus is not the mere existence of a license, but the license's scope. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087–88 (9th Cir. 1989).

Courts that have addressed the scope of a license to use—or defined the meaning of the word "use"—have relied on normal contract interpretation principles. *See, e.g., id.* at 1088 n.8 (noting that the "right of use" might be properly construed to include the right to modify the

software based on the particular language of the contract); *Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 693–95 (7th Cir. 1999); *Compliance Source, Inc. v. GreenPoint Mortg. Funding, Inc.*, 624 F.3d 252, 259–60 (5th Cir. 2010) (reversing the district court for "look[ing] past the actual language of a licensing agreement and" ruling based on holdings from other cases with significantly different licensing agreements); *Womack+Hampton Architects, L.L.C. v. Metric Holdings Ltd. P'ship*, 102 F. App'x 374, 379–81 (5th Cir. 2004) (determining, among other things, "the meaning of the right to use" is a license based on Texas contract law).

Although a license to use may grant the right to modify without expressed language in the contract, *Kennedy*, 187 F.3d at 693, several cases have interpreted that a contract that conveys a bare license to use software does not convey a right to modify that software. *See S.O.S.*, 886 F.2d at 1088; *Berry v. Fleming Co.*, 243 F. App'x 260, 261–62 (9th Cir. 2007); *Facility Wizard Software, Inc. v. Se. Tech. Servs., LLC*, 647 F. Supp. 2d 938, 950 (N.D. Ill. 2009). The Court considers these cases persuasive in interpreting section 19(d).

Equistar argues that the Master Contract's license provision is distinguishable from those cases because, unlike those licenses, section 19(d) does not convey a bare license to use. (*See* Doc. No. 56 at 2–6; Doc. No. 61). Instead, Equistar contends that the "necessary for the use (including operation, maintenance, repair, reconstruction and modification)" language serves as the defined purposes for Equistar to use the source code. (*See* Doc. No. 56 at 4). As explained in detail above, the Court rejects that construction of the contract.[18]

---

[18]Assuming, *arguendo*, that Equistar's interpretation of section 19(d)—that "necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the [boilers and PLCs]" are the defined purposes for how Equistar is allowed to use the source code—is correct, then the Court would find that Equistar is entitled "read and write access" or the ability to modify the source code. Equistar is unable to, at least, modify the boilers and PLCs without the ability to modify the source code. As explained above, Indeck does not dispute this fact. Instead, it argues that modifying or reconstructing the boilers would exceed the scope of the purchase order. (*See* Doc. No. 57 at 15–16). That interpretation, however, fails to follow the language of section 19(d), which has no limitation to the scope of the purchase order. Moreover, the words "modification" and "reconstruction" would be rendered meaningless if the use of the source code could only apply to the boilers in the condition that Indeck sold them to Equistar.

Further, even if the "that are necessary for the use (including operation, maintenance, repair, reconstruction and modification) of the [boilers and PLCs]" language meant to define the scope of Equistar's use of Indeck's technology, the Court is not persuaded that section 19(d) permits the license to use the source code to include the ability to unilaterally modify it.[19] Specifically, the contract expressly states that the technologies are "owned *and controlled*" by Indeck. Interpreting section 19(d) to allow Equistar to modify the source code would preclude Indeck from being able to control its source code. In other words, if Equistar can modify any "technology" under the license provision, then Indeck cannot control it. Since Texas law requires courts to read contracts as a whole and give meaning to every provision, the Court must reject an interpretation that would render "controlled by" Indeck meaningless. *Cf. Weaver*, 939 F.3d at 626.

The "owned and controlled" language in section 19(d) is analogous to the license in *S.O.S.*, which stated, "[The] series of programs is the property of SOS, and PAYDAY is acquiring the right of use, SOS retains all rights of ownership." *See*, 886 F.2d at 1088. The Ninth Circuit held that the expressed retention of "*all* rights of ownership[,]" meant Payday did not acquire "any more than the right to process a copy of the software for the purpose of producing 'product' for its customers." *Id.* (emphasis in original). Accordingly, Payday exceeded the scope of the license when it copied and prepared a modified version of the programs without S.O.S.'s permission. *Id.* at 1089. Similarly, section 19(d) unambiguously states that the technologies covered by the license—including the source code—are owned and controlled by Indeck. Like the retention of all rights of ownership in *S.O.S.*, Indeck's retention of control makes clear that the parties did not

---

[19] Equistar is, of course, permitted to have the source code changed and modified over the life of the boilers and PLCs at the Tuscola Plant. It is just precluded from making those changes in the source code itself without Indeck's permission. As quoted above, Indeck testified that it is willing to assist Equistar in this regard—it is just not willing to do so without being compensated. (*See* Tr. at 548 (Testimony by Marsha Lynn Forsythe)).

intend for Equistar to have the ability to modify or alter the source code without Indeck's consent. *See id.* at 1088.

Additionally, section 19(d) contains the word "use" twice—once as a verb ("a license to use") and once as a noun ("for the use . . . of").[20] The parties made the decision to define, or at least limit, the second "use" ("for the use . . . of") to include terms that may not be included in the word's plain and ordinary meaning (i.e., "operation, maintenance, repair, modification, and reconstruction"). This is significant under Texas contract law for multiple reasons.

First, the parties' decision to provide a definition to the second "use", regardless of which side it favors, suggests that it should be read to have a different meaning than the first "use." *See Cadence Bank v. Elizondo*, No. 01-17-00886-CV, 2020 WL 1150126, at *12 & n.4 (Tex. App.— Houston [1st Dist.] Mar. 10, 2020, pet. filed) ("[T]he presumption of consistent usage [explains that] a material variation in terms suggests a variation in meaning . . . .") (first citing *In re CVR Energy, Inc.*, 500 S.W.3d 67, 77 (Tex. App.—Houston [1st Dist.] 2016, no pet.); and then citing *Horseshoe Bay Resort, Ltd. v. CRVI CDP Portfolio, LLC*, 415 S.W.3d 370, 384 & n.7 (Tex. App.—Eastland 2013, no pet.)).[21] The fact that the parties felt the need to ensure that "the use of the [boilers and PLCs]" (the second "use") included operation, maintenance, repair, reconstruction and modification suggests that they did not intend for the phrase "to use" (the first "use") to include those terms to be included in the meaning of the word "use." Significantly, that means that the license "to use" the source code does *not* include a license to modify the source code.

---

[20] Although the parties included a glossary to the Master Contract, they did not define the word "use" in that section. (*See* Plaintiff's Ex. 11 at 1–2, §1). Nevertheless, the Master Contract contains the word "use" over 25 times. Only two of those times does the contract expressly state that "use" includes operation, maintenance, repair, reconstruction, and modification—the license provision and section 20(a)(vi). (*Id.* at 14–15). *See also, supra* note 14. On both occasions, the word "use" is acting as a noun (i.e., in the context of "for the . . . use . . . of the [boilers and PLCs]"). That is noticeably different from the word acting as a verb (e.g., in the context a "license to use").

[21] The presumption of consistent usage also supports a different definition of the word "use" when it is acting as a verb and when it is acting as noun. *See, supra* note 14.

Similarly, "the rule against surplusage [counsels] that a term should not be given an interpretation that causes it to duplicate another term or to have no consequence." *Id.* at *12 & n.5 (citing *Bishop v. Owens*, No. 01-13-00678-CV, 2014 WL 4260520, at *8 (Tex. App.— Houston [1st Dist.] Aug. 28, 2014, no pet.) (mem. op.)). In this case, Equistar's license "to use" a technology (which includes the source code) cannot mean Equistar can modify the technology without rendering the inclusion of the word "modification" in definition of "the use of the [boilers and PLCs]" duplicative and superfluous. *See id.*; *see also Weaver*, 939 F.3d at 626 (directing courts to give effect to all the provisions of the contract "so that none will be rendered meaningless.") (internal citation and quotation omitted). In sum, the parties' decision to specifically define the word "use" in the latter portion of section 19(d) (and to have it operate as a noun), must mean that they intended for the undefined "use" acting as a verb in the same provision to have a different meaning.

Accordingly, Equistar's license to use the source code does not convey it access to the source code such that Equistar can modify the source code.[22]

## IV.    Conclusion

Having carefully considered the parties' arguments, the testimony of all of the witness, and exhibits, the Court hereby finds that, under section 19(d) of the parties' Master Contract, Defendant Indeck Power Equipment Company granted Plaintiff Equistar Chemical, L.P. a license to use certain technologies, including the source code. Based on the unambiguous language of the Master

---

[22] The Court recognizes that during trial and in its briefing Equistar used the terminology "read and write access" to the source code. That phrase may be common jargon in the software industry, but it was not defined by Equistar. "Read and write access" was also not used by the parties in the Master Contract. A vast majority of Equistar's argument is that it needs the ability to modify the source code. (*See, e.g.*, Tr. at 164 (Testimony of Perry Danniger Smith) ("[View access] helps me verify what is there today, which is good; but it gives me no ability to understand how to change things, improve things, adapt to regulation changes, things we already see are problems. So it doesn't allow me to do maintenance. It doesn't allow me to fix problems we already see.")). The Court therefore interprets "read and write access" to mean access that allows Equistar to modify the source code. As explained above, the Court finds that section 19(d)'s license to use the source code does not give Equistar that legal right.

Contract, however, the Court determines that the license to use the source code does not include the right to unilaterally modify the source code. Accordingly, Indeck's refusal to give Equistar "read and write access" to the source code is not a breach of section 19(d) of the Master Contract. For these reasons, the Court finds in favor of Indeck on Equistar's breach of contract claim.

As for Equistar's claim for declaratory judgment, for the reasons stated above, the Court finds in Equistar's favor concerning whether section 19(d) gives it license to use the source code, but the Court rules in favor of Indeck to the extent that Equistar claims the license to use the source code included "read and write access" of the source code.[23]

SIGNED at Houston, Texas this 17 day of August, 2020.

Andrew S. Hanen
United States District Judge

---

[23] The factual statements (as opposed to descriptions of the parties' factual contentions) are to be considered findings of fact whether or not they are so designated. The conclusions of law (as opposed to the parties' legal arguments) are to be considered conclusions of law whether or not they are so designated.